Nancy LOZADA, Bob Warren, A.D. Christian and Jeanne Uwamaliya, on behalf of themselves and all other similarly situated, Plaintiffs,

v.

DALE BAKER OLDSMOBILE, INC., a Delaware corporation, d/b/a Dale Baker Kia, d/b/a Dale Baker Suzuki, d/b/a Fresh Start Auto Center, and d/b/a National Fleet Liquidators of Michigan; and CFC–Consumer Finance Corporation, f/k/a Consumer Finance Corporation, a Virginia corporation, Defendants.

No. 1:99–CV–620.

United States District Court, W.D. Michigan, Southern Division.

March 27, 2000.

John E. Anding, Drew, Cooper & Anding, Phillip C. Rogers, Grand Rapids, MI, for Plaintiffs.

David William Centner, Law, Weathers & Richardson, Michael D. Wade, Garan, Lucow, Miller & Seward, PC, David N. Campos, Grand Rapids, MI, Charles L. McKelvie, Dold, Spath & McKelvie, PC, Troy, MI, William K. Holmes, Warner, Norcross & Judd, LLP, Grand Rapids, MI, for Defendants.

## OPINION

HILLMAN, Senior District Judge.

Plaintiffs are consumers who have filed a class action complaint alleging that Defendant Dale Baker Oldsmobile, Inc. ("Dale Baker Olds") failed to provide them a copy of their retail installment contracts at the time of execution, allegedly in violation of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.*, the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws §§ 445.901 *et seq.*, the Michigan Motor Vehicle Installment Sales Contracts Act ("MVISCA"), Mich. Comp. Laws §§ 566.301 *et seq.*, the Michigan Motor Vehicle Sales Finance Act ("MVSFA"), Mich. Comp. Laws §§ 492.101 *et seq.*, and the Michigan Vehicle Code, Mich. Comp. Laws §§ 257.1 *et seq.* Plaintiffs' complaint also names as a defendant CFC–Consumer Finance Corporation ("CFC"), the assignee of a contract between Dale Baker Olds and one of the named plaintiffs. The matter presently is before the court on three motions: (1) a motion to dismiss filed by defendant Dale Baker Olds (docket # 17); (2) a motion to dismiss filed by defendant CFC (docket # 7); and (3) an alternative

motion to compel arbitration and to dismiss filed by CFC (docket # 8). I have considered the briefs of the parties, together with oral arguments heard December 12, 1999. For the reasons that follow, I **DENY** the motions, with the exception of the motion of CFC to dismiss plaintiffs' TILA claim, which is **GRANTED.**

## I.

The following facts are taken from the allegations of plaintiffs' complaint. Plaintiffs Nancy Lozada, Bob Warren, A.D. Christian and Jeanne Uwamaliya were all customers of Dale Baker Olds who sought to purchase motor vehicles on credit. Because of their credit histories, Dale Baker Olds salesmen determined that plaintiffs would not be eligible for conventional auto financing. As a result, the salesmen referred plaintiffs to the Dale Baker Olds special finance department or Credit Resources Center. After selecting a vehicle, each plaintiff was introduced to the Assistant Special Finance Manager, Stormie Moore, to complete the necessary documentation to obtain credit to finance their vehicles in the sub-prime credit market. At that time, each plaintiff was presented with and signed a Retail Installment Contract which contained disclosures of the annual percentage rate, finance charge, amount financed, total sale price, and payment schedule. Those disclosures were contained under the heading "TRUTH IN LENDING DISCLOSURES" and placed immediately above the signature line.

While plaintiffs were shown the retail installment contracts at the time they signed them and while those installment contracts contained disclosures, plaintiffs were not given a copy of the contracts or disclosures until some days after they signed their agreements. Plaintiff Lozada received a copy ten days after signing the document. Plaintiff Warren received a copy two days after signing the document. Plaintiff Christian received a copy fifteen days after signing.

On the basis of this history, plaintiffs contend that Dale Baker Olds failed to make the disclosures required by the TILA and the relevant regulations promulgated by the Federal Reserve Board pursuant to its authority under the TILA. Dale Baker Olds has moved to dismiss plaintiffs' TILA claim pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim, and, assuming dismissal of the federal claim, to dismiss plaintiffs' state law claims for lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1).

Plaintiffs contend that CFC, as assignee of Dale Baker's contract with plaintiff Christian, is liable both under the federal and state statutes and under the terms of the contract. Defendant CFC also has moved to dismiss for failure to state a claim. CFC moves in the alternative to dismiss and compel arbitration in accordance with the contract.

## II.

### A. *Standard of Review*

Under Fed.R.Civ.P. 12(b), a complaint may be dismissed if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts must be accepted as true. *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987). However, the court need not accept as true legal conclusions or unwarranted factual inferences. *Lewis v. ACB Business Serv., Inc.,* 135 F.3d 389, 405 (6th Cir.1998). A complaint fails to state a claim upon which relief can be granted when it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. *Jones v. City of Carlisle,* 3 F.3d 945, 947 (6th Cir. 1993), *cert. denied,* 510 U.S. 1177, 114 S.Ct. 1218, 127 L.Ed.2d 564 (1994).

## B. *Motion to Dismiss of Dale Baker Olds*

■ The TILA grants broad authority to the Federal Reserve Board to promulgate regulations necessary to implement the Act. *See Mourning v. Family Publications Service. Inc.,* 411 U.S. 356, 366, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); 15 U.S.C. § 1604(a). Courts interpreting the TILA defer to the regulations developed by the Federal Reserve Board. *See Begala v. PNC Bank, Ohio, National Ass'n,* 163 F.3d 948, 950 (6th Cir.1998). Because the TILA is a remedial statute, the courts also give liberal construction to the Act in favor of the consumer. *See id.* (citing cases).

Pursuant to its grant of authority, the Federal Reserve Board adopted Regulation Z, 12 C.F.R. § 226.1 *et seq.* Both the Act and Regulation Z require that a creditor in a closed-end transaction make disclosures to the consumer of the following items: the identity of the creditor, the amount financed, the annual percentage rate, the total of payments, and the total sale price. *See* 15 U.S.C. § 1638(a); 12 C.F.R. § 226.18. The TILA requires that a creditor make the required disclosures "before the credit is extended." 15 U.S.C. § 1638(b). Regulation Z provides that "[t]he creditor shall make disclosures before consummation of the transaction." 12 C.F.R. § 226.17(b). "Consummation" is defined as the time "the consumer becomes contractually obligated on a credit transaction." 12 C.F.R. § 226.2(a)(13). Regulation Z also provides the manner in which disclosures shall be made. In closed-end credit transactions, "[t]he creditor shall make the disclosures ... clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. § 226.17(a)(1).

In their complaint, plaintiffs contend that the date of consummation in plaintiffs' credit transactions is the date on which they signed their contracts and thereby became "contractually obligated" to pay. *See* 12 C.F.R. § 226.2(a)(13). They further contend that Dale Baker Olds failed to comply with Regulation Z because, while Dale Baker Olds showed written disclosures to plaintiffs prior to their signing, it failed to provide those disclosures "in a form that the consumer may keep" prior to plaintiffs becoming contractually obligated to pay. 12 C.F.R. § 226.17(a)(1), (b).

Dale Baker Olds has moved to dismiss, contending that plaintiffs' sole federal claim under the TILA fails to state a claim for relief. Specifically, Dale Baker Olds contends that assuming the date plaintiffs signed their contracts was the date of consummation, it nevertheless complied with the regulation because it made the required disclosures to plaintiffs in writing before plaintiffs signed their contracts of sale. Dale Baker contends that Regulation Z does not require that a copy of the disclosures be delivered to the plaintiffs prior to consummation.

I disagree. The regulation requires that the required disclosures be made "in writing, in a form that the consumer may keep." 12 C.F.R. § 226.17(a)(1). Were the court to accept the position of Dale Baker that the regulation required only that consumers be shown the disclosures before becoming contractually obligated, the phrase "in a form that the consumer may keep" would be rendered meaningless. In other words, if the regulation means no more than that disclosures be made to consumers *in writing,* no additional meaning would be conveyed by requiring the form be one the consumer could keep.

As a basic principle of statutory construction, in interpreting any statute or regulation, this court must select an interpretation that gives meaning to all parts of that statute or regulation. *See Armstrong Paint & Varnish Works v. Nu–Enamel Corp.,* 305 U.S. 315, 333, 59 S.Ct. 191, 83 L.Ed. 195 (1938) ("Where, as here, the language is susceptible of a construction which preserves the usefulness of the section, the judicial duty rests upon this Court to give expression to the intendment

of law."). The presence of the phrase, therefore, compels a conclusion that the regulation requires actual delivery of the disclosures to the consumer.

The language of the phrase itself also suggests that delivery is required. Requiring that disclosures be made before consummation in a "form that the consumer may keep" requires that the actual consumer involved in the transaction receive disclosures and be able to keep those disclosures before consummation. If the court were to accept Dale Baker's contention that showing the disclosures to a consumer before consummation is sufficient to comply with the regulation, then either the consumer who may keep the disclosures would be rendered hypothetical or the timing for disclosure in the form *this* consumer may keep would necessarily be post-consummation, which is after the time required by § 226.17(b).

Taken together, I am persuaded that the plain language of 12 C.F.R. § 226.17(a)(1), when read together with 12 C.F.R. § 226.17(b), requires delivery of a copy of the required disclosures to a consumer before consummation of the transaction. Moreover, the courts which have addressed this issue have uniformly held that pre-consummation delivery of a copy of the disclosures is necessary to meet the requirements of the regulations. *See Jenkins v. Landmark Mortgage Corp. of Virginia,* 696 F.Supp. 1089, 1091 (W.D.Va. 1988) (holding that consumer did not receive the disclosures in a form she could take with her until after consummation where consumer was shown and signed disclosures at time she signed contract, but did not receive a copy of disclosures until several days later); *In re Williams,* 232 B.R. 629 (Bankr.E.D.Pa.) (holding that failure to provide consumer with copy of TILA disclosures constituted failure to disclose), *aff'd as corrected,* 237 B.R. 590 (E.D.Pa.1999); *Shepeard v. Quality Siding & Window Factory, Inc.,* 730 F.Supp. 1295, 1300 (D.Del.1990) (holding that disclosures must be made in writing and that

consumer must be given a copy of the written disclosure); *In re Ralls,* 230 B.R. 508, 515 (Bankr.E.D.Pa.1999) (holding that Regulation Z requires that lenders disclose to consumers in writing "in a form the consumer may examine and retain for reference").

Finally, this interpretation of the regulation is most fully consistent with the purpose of the statute. The stated purpose of TILA was "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). The purpose is to provide the borrower "an opportunity to do some comparative shopping for credit terms." *Wachtel v. West,* 476 F.2d 1062, 1064 (6th Cir.1973), *cert. denied* 414 U.S. 874, 94 S.Ct. 161, 38 L.Ed.2d 114 (1973). Without being able to take a copy of the terms of the disclosures to another credit source, the consumer is far less able to compare the reasonableness of the terms. *See id.* at 1065 (stating that to fully serve the purposes of the Act, "the borrower must have the required information in his possession before he commits to any particular lender.").

Although not argued in its brief, Dale Baker Olds raised a second basis for dismissal at oral argument. Dale Baker Olds asserts that the transaction was not consummated until Dale Baker Olds successfully obtained approval of financing through a sub-prime lender. Dale Baker Olds contends that until such time as financing was obtained, plaintiffs did not become obligated to pay on their installment contracts. Accordingly, Dale Baker Olds asserts that it was not required to provide a copy of the disclosures until financing was obtained.

First, even were the transaction not consummated until financing was approved, the complaint nonetheless would state a claim for relief. Dale Baker Olds does not represent that it sent a copy of the disclosures to each plaintiff before financing was

approved. Instead, Dale Baker's representation at oral argument was that plaintiffs received copies of their documents *after* financing was approved. In light of my conclusions regarding the meaning of Regulation Z disclosure requirements, such disclosures still would not be timely.

■ Second, Dale Baker's interpretation of when consummation occurred under the Act is at odds with the plain meaning of the regulations. Pursuant to 12 C.F.R. § 226.2(a)(13), "consummation" is defined as "the time that a consumer becomes contractually obligated on a credit transaction." The Official Staff Commentary to the regulations makes clear that when a contractual obligation on the consumer's part is created is a matter to be determined under applicable state law. Official Staff Commentary § 226.2(a)(13). Under Michigan law, a contract unquestionably was created when plaintiffs signed their retail installment contracts and security agreements. The documents, which were drafted by Dale Baker Olds and presented to plaintiffs, purported to be contracts and by their signatures the plaintiffs agreed to be bound by the terms of those contracts. Dale Baker Olds did not make the contracts contingent on plaintiffs' obtaining financing. Accordingly, under state law and under the Act, plaintiffs consummated their transactions at the time they entered into the retail installment contracts.

For all these reasons, plaintiffs' allegation that Dale Baker Olds failed to provide a copy of the TILA disclosures to plaintiffs prior to their becoming obligated under the contracts states a claim under the TILA. The motion of Dale Baker Olds to dismiss for failure to state a claim (docket # 17) therefore is **DENIED**.

### C. *Motion to Dismiss of CFC*

Defendant CFC moves to dismiss the complaint for failure to state a claim on two grounds. First, it contends that plaintiff Christian may assert an independent cause of action against an assignee only if he can prove a right to recission of the entire contract. Second, it argues that plaintiff Christian's claim against CFC is not cognizable under the TILA and must be dismissed. I will address each in turn.

### 1. FTC Holder Rule

■ CFC, as an assignee of the contract between Dale Baker Olds and plaintiff Christian, is a defendant pursuant to the following language in the contract:

Any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder.

CFC contends that the contractual language is mandated by a regulation developed by the Federal Trade Commission, commonly known as the FTC Holder Rule. *See* 16 C.F.R. § 433.2. CFC asserts that because the FTC Holder Rule mandates inclusion of the contract term by law, the reach of the provision is limited by the law surrounding implementation of the rule. CFC asserts that the FTC intended the rule only to permit affirmative actions (as opposed to defenses) in circumstances in which the consumer experienced a loss sufficiently great to warrant recission. Because Christian makes no assertion that recission is appropriate on the facts, CFC contends that regardless of the contractual language, no claim lies against CFC. Accordingly, it contends, plaintiffs' entire complaint against CFC must be dismissed.

In support of its contention, CFC relies upon a portion of the official Statement of Basis and Purpose published by the FTC with the rule:

This rule is directed at the preservation of consumer claims and defenses. It will require that all consumer credit contracts generated by consumer sales include a provision which allows the consumer to assert his sale-related claims and defenses against any holder of the

credit obligation. From the consumer's standpoint, this means that a consumer can (1) defend a creditor suit for payment of an obligation by raising a valid claim against the seller as a set-off, and (2) maintain an affirmative action against a creditor who has received payments for a return of monies paid on account. *The latter alternative will only be available where a seller's breach is so substantial that a court is persuaded that recission and restitution are justified.* The most typical example of such a case would involve non-delivery, where delivery was scheduled after the date payments to a creditor commenced.

Federal Trade Commission, Preservation of Consumers' Claims and Defenses, Final Regulation and Statement of Basis and Purpose, 40 Fed.Reg. 53505, 53524 (Nov. 18, 1975) (Holder Rule codified at 16 C.F.R. § 433.2) (emphasis added). CFC contends that the quoted commentary limits the reach of the contract language (which permits affirmative actions against assignees of consumer credit contracts) to only those situations in which recission is a proper remedy. *See Ford Motor Credit Co. v. Morgan,* 404 Mass. 537, 536 N.E.2d 587 (Mass.1989) (holding that the language of the notice provision must be considered in the context of its purpose, which was intended to allow affirmative actions only in limited circumstances not presented in that case); *In re Hillsborough Holdings Corp.,* 146 B.R. 1015, 1021 (Bankr. M.D.Fla.1992) (same); *Felde v. Chrysler Credit Corp.,* 219 Ill.App.3d 530, 162 Ill. Dec. 565, 580 N.E.2d 191, 196 (1991); *Mount v. LaSalle Bank Lake View,* 926 F.Supp. 759, 764–65 (N.D.Ill.1996).

Other courts, however, have rejected the notion that FTC commentary may be applied to limit the clear language of the notice required by the Holder Rule:

> The clear and unambiguous language of the [FTC Holder Rule provision] notifies all potential holders that, if they accept an assignment of the contract, they will be "stepping into the seller's shoes." The creditor/assignee will become "subject to" *any* claims or defenses the debtor can assert against the seller. The [provision] does not say that a seller will be liable for the buyer's damages only if the buyer received little or nothing of value under the contract. Nor does the [provision] purport to limit a creditor/assignee's liability in such fashion.

*Oxford Finance Companies, Inc. v. Velez,* 807 S.W.2d 460, 463 (Tex.App.1991). *See also Simpson v. Anthony Auto Sales,* 32 F.Supp.2d 405, 409 n. 10 (W.D.La.1998) (holding that FTC Holder Rule permitted consumers to bring claims against assignee without regard to whether damages warranted recission); *Riggs v. Anthony Auto Sales, Inc.,* 32 F.Supp.2d 411, 416 n. 13 (W.D.La.1998) (same); *Van Vels v. Premier Athletic Center of Plainfield, Inc.,* 182 F.R.D. 500, 508 (W.D.Mich.1998) (expressing doubt about interpretation of FTC Holder Rule in *Mount,* 926 F.Supp. at 764, which limited affirmative claims available against assignees to those which are sufficiently egregious to warrant recission); *Alduridi v. Community Trust Bank, N.A.,* No. 01A01–9901–CH–00063, 1999 WL 969644 (Tenn.App.1999) (holding that "FTC Guidelines contemplate recovery where recission is not warranted ....").

I find most persuasive those courts which conclude that the Holder Rule does not limit affirmative claims only to those circumstances where recission would be appropriate. At the outset. I note that at least one of the leading decisions relying on the agency's Statement of Basis and Purpose to limit the reach of the rule rests on a faulty construction of the Statement as the "rule" itself. *See, e.g. Mount,* 926 F.Supp. at 763. The Statement of Basis and Purpose is not itself a rule. Instead, it is a lengthy explanation of the history and reasoning for implementation of the rule. The rule simply mandates the inclusion of specific language in consumer credit transactions. As a result, the Statement

is not on the same footing as the language of the regulation itself. *See Jerri's Ceramic Arts, Inc. v. Consumer Product Safety Comm'n,* 874 F.2d 205, 207–08 (4th Cir.1989) (distinguishing effect of agency interpretative rules, which are statements of what the agency thinks a statute means, from substantive or legislative rules, issued pursuant to delegated authority, which have the force of law).

In addition, the Holder Rule itself is unambiguous. *See Oxford,* 807 S.W.2d at 463. It requires the inclusion of language in all contracts without limitation on the types of "claims and defenses" which may be brought against the assignee. The rule was adopted to exempt consumer credit transactions from the holder-in-due-course principles of commercial transactions. *See FTC v. Winters Nat'l Bank & Trust Co.,* 601 F.2d 395, 397 (6th Cir.1979) (noting that Holder Rule strips the holder of consumer paper of its traditional status as a holder-in-due-course and subjects it to "any potential defenses" which the purchaser might have against the seller). No basis exists for referring to the commentary to understand the meaning of language that is unambiguous on its face. *See Homemakers North Shore, Inc. v. Bowen,* 673 F.Supp. 238, 241 (N.D.Ill.1987) ("Were the language of the ... regulation unambiguous, moreover, we should apply its plain meaning, even if the Secretary posited a contrary interpretation.") (citing *St. Francis Hosp. Center v. Heckler,* 714 F.2d 872, 873 (7th Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984)); 3 JACOB A. STEIN, GLENN A. MITCHELL, BASIL J. MEZINES & JOAN D. MEZINES, ADMINISTRATIVE LAW, § 13.03[1], at 13–44 (1977 & Supp.1995) ("[R]ules and regulations validly promulgated pursuant to congressional authority have the full force and effect of law. Therefore, an agency is as much bound by its own properly promulgated rules as the persons affected by them.").

Moreover, even were it permissible to look at the commentary in determining the meaning of unambiguous language, that commentary is susceptible of being understood as a statement of agency prediction that affirmative recoveries will occur only when courts are persuaded that the equities so require and when damages exceed the amount due on the account, as opposed to CFC's interpretation that the agency intended to limit the reach of the rule. Indeed, the sentence upon which CFC relies modifies the previous sentence, which discusses the ability of a consumer to maintain an affirmative action *"for a return of monies paid on account."* Clearly, the ability to bring suit to recover monies paid—as opposed to reducing an amount owed—typically will only occur in cases of recission. Since the language may be read as prediction, as opposed to limitation, and since reading the language as prediction, rather than as limitation, is the only reading that is fully consistent with the unambiguous language, such interpretation should be preferred.

In addition, the original FTC Statement of Basis and Purpose is not limited to the narrow statement cited by CFC. Instead, the FTC discusses at length the rationale for the rule, concluding that the purpose of the Rule is to reallocate the costs of seller misconduct in the consumer market, "compel[ling] creditors to either absorb seller misconduct costs or return them to sellers ...." 40 Fed.Reg. at 53523. The FTC noted a variety of measures by which assignees could shift any liability back on the sellers. *Id.* In so doing, it observed that "where a consumer claim or defense is valid, but limited in amount, a creditor may choose to accept less payment from the consumer to save transaction costs associated with pursuing the seller whose conduct gave rise to the claim." *Id.* Such language strongly indicates that the FTC contemplated that consumer claims could be smaller than total recission and that it was for an assignee to determine which mechanisms for allocating costs of seller misconduct best served its purposes.

The Statement also expressly notes the need for consumer actions against assignees because "the worst sellers are likely to be the most volatile entities where market tenure is concerned. They prove difficult to locate and serve, and the marginal liquidity which characterizes their operations makes collection of a judgment difficult or impossible even if they are successfully served." 40 Fed.Reg. 53512. As a result of this history, as the Statement expressly observes, the FTC intended to shift the risk of seller misconduct from the consumer to the seller and assignees. *See* 40 Fed.Reg. at 53523 ("This rule approaches these problems by reallocating the costs of seller misconduct in the consumer market."); *Maberry v. Said,* 911 F.Supp. 1393, 1402 (D.Kan.1995) ("The FTC holder rule reallocates the cost of seller misconduct from the consumer to the creditor.")

No single portion of the official Statement of Basis and Purpose issued with the rule is entitled to greater deference in this court. Where one or more parts of the Statement fully comport with the text of the rule while another, read in a particular way, is at odds with the plain language of the regulation, there exists no basis for giving controlling weight to an interpretation which narrows the language of the rule itself.

I also note that one year after the adoption of the Holder Rule, the FTC issued Guidelines for the Holder Rule, stating:

This limits a consumer to a refund of monies paid under the contract, in the event that an affirmative money recovery is sought. In other words, the consumer may assert, by way of claim or defense, a right not to pay all *or part* of the outstanding balance owed the creditor under the contract; but the consumer will not be entitled to receive from the creditor an affirmative recovery which exceeds the amounts of money the consumer has paid in . . . .

41 Fed.Reg. 20,022, at 20,023–24 (1976) (emphasis added). The Guidelines state that the required notices under the Holder Rule "protect the consumer's right to assert against the creditor *any legally sufficient claim* or defense against the seller. *The creditor stands in the shoes of the seller.*" 41 Fed.Reg. at 20,023 (emphasis added). These added guidelines make clear that the agency understood that affirmative action was contemplated for recovery of "part" of the outstanding balance owed the creditor-assignee. Rather than recission being the sole circumstances under which recovery was contemplated, the language of the Guidelines clearly suggests that the agency contemplated that recission represented the maximum damage for which an assignee may be liable, as expressly stated in the Holder Rule itself. They also emphasize the intent of the rule to place creditors in the shoes of the seller.

Moreover, since issuance of the previous commentary, the FTC has indicated in a staff opinion letter that it views the provision as clear, placing no limitations on the availability of consumer claims against assignees. *See* FTC Informal Staff Letter (Sept. 25, 1999); Ex. A to Pl. Brief in Response. The FTC opinion letter expressly rejects the reasoning of *Ford Motor Co. v. Morgan,* 404 Mass. 537, 536 N.E.2d 587, 589–90, the leading case upon which all other decisions limiting claims rest.[1] The letter interprets the agency's

---

1. Although the *Morgan* decision provides the foundation for most decisions holding that consumers may not bring affirmative claims under contractual notices prescribed by the Holder Rule, the reach of the *Morgan* decision is far more limited. The *Morgan* court did not hold that a consumer may never bring an affirmative cause of action in the absence of grounds for recission. Indeed, the *Morgan* court expressly rejected such a conclusion as being at plain odds with the FTC's intention:

We do not hold that a consumer may only assert his rights defensively in response to a claim initiated by an assignee for balance due on the contract. This would be in clear contravention of the FTC's intention . . . . "Under such circumstances the financier may elect not to sue, in the hopes that the threat of an unfavorable credit report may

comment in the Statement of Basis and Purpose as a prediction rather than as an intended limitation. Like other agency commentary, an agency's decisions implementing its statutory authority are entitled to substantial deference. *See Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980) (noting that "the interpretation given [a] statute *by the officers* or agency charged with its administration is due considerable respect by the courts") (emphasis added).

I therefore conclude that neither the text nor the commentary to the Holder Rule limits the availability of affirmative consumer claims against assignee-creditors to those who assert a right of recission under common law.

In its reply brief, CFC also raises another source of law which it contends reinforces a limited reading of the Holder Rule. Specifically, CFC refers to a series of court decisions discussing the language contained in the Uniform Commercial Code ("UCC") § 9–318(1)(a), which provides that "the rights of an assignee are subject to ... all the terms of the account debtor and assignor and any defense or claim arising therefrom." *See Michelin Tires (Canada) Ltd. v. First Nat'l Bank of Boston,* 666 F.2d 673 (1st Cir.1981). Interpreting the provision, some courts have concluded that the fact that § 9–318(1)(a) makes assignee rights "subject to" any defense or claim arising from the contract between the account debtor and assignor does not in any way indicate that the provision was intended to create affirmative rights against the assignee. *Id.* at 677.

The language of UCC § 9–318(1)(a), however, while bearing some similarity to the language of the Holder Rule, is substantially distinct in that it does no more

than limit the *rights* of the assignee to claims or defenses arising from the transaction. In contrast, the Holder Rule expressly subjects the *assignee itself* to "all claims and defenses which the debtor could assert against the seller." The language of the Holder Rule, therefore, is both broader than the UCC provision and unambiguous. As a result, the decisions under the UCC § 9–318(1)(a) are neither analogous nor applicable.

Finally, even were the court to conclude that the Holder Rule bars affirmative claims for damages less than recission, such an interpretation would not warrant dismissal of all of plaintiffs' state-law claims in this action. The Michigan Vehicle Sales Finance Act ("MVSFA"), Mich. Comp. Laws § 492.114a(c), statutorily requires that the installment contracts at issue in the instant case contain the identical language required by the FTC Holder Rule. As Judge Enslen held in *Van Vels* 182 F.R.D. at 508, while the limitation of the Holder Rule to claims for recission

> is questionable as an interpretation of TILA, it simply has no application to MRISA. Michigan Compiled Laws Section 445.865(d), Section 15(d) of MRISA, simply states that:

>> A holder of a retail installment contract of the buyer is subject to all the claims and defenses of the buyer arising out of the retail installment transaction, but the buyer's recovery shall not exceed the amount paid to the holder thereunder.

> This is a straight forward statute, which makes the assignee subject to MRISA claims but limits the assignee's liability to the amount of payments received. It should not be read as containing additional requirements (that the claim be one entitling the plaintiff to recission under state law) which are absent from

---

move the consumer to pay." 40 Fed.Reg. at 53527. Therefore, it is clear that the account debtor may initiate suit to enforce his right, however limited it may be, to discontinue credit payments.

*Morgan,* 404 Mass. at 543 n. 5, 536 N.E.2d at 590 n. 5. Even under the *Morgan* decision, therefore, a consumer may initiate suit for damages as a setoff to remaining payments owed on the contract or to discontinue those payments.

the statutory language and which run contrary to the remedial purpose of the statute.

*Id.* In other words, even if the FTC's commentary were applicable to the interpretation of the Holder Rule language as it applies to TILA claims, that commentary simply has no bearing on the interpretation of a state statute requiring the identical language. As a result, plaintiffs' state law claims may not be limited based upon a comment by the Federal Trade Commission made pursuant to its authority to regulate federal requirements. Plaintiffs' state-law claims, therefore, may not be dismissed based on a limited understanding of the Holder Rule. *See also* 41 Fed. Reg. at 20023–24 ("The limitation on affirmative recovery does not eliminate any other rights the consumer may have as a matter of local, state, or federal statute.").

## 2. Exclusion from TILA pursuant to 15 U.S.C. § 1641(a)

■ CFC next contends that plaintiffs' federal TILA claim against CFC must be dismissed because the TILA, as amended in 1980, provides that

> [A]ny civil action for a violation of this subchapter ... which may be brought against a creditor may be maintained against any assignee of such creditor only if the violation for which such action ... is brought is apparent on the face of the disclosure statement ....

15 U.S.C. § 1641(a). CFC asserts that the failure of Dale Baker Olds to provide a copy of the TILA disclosures to plaintiff Christian prior to his signing of the contract was not apparent on the face of the contract. Indeed, the contract itself declares that a copy was given to Christian. Accordingly, CFC contends that it is entitled to dismissal of the TILA claim.

In their responsive brief, plaintiffs initially asserted that the language of 15 U.S.C. § 1641(a) as amended in 1980 did not take precedence over the FTC Holder Rule adopted in 1975. At oral argument, however, plaintiffs conceded that the TILA claim against CFC fails to state a claim because the violation was not apparent on the face of the disclosure statement.

CFC's assertion and plaintiffs' concession unquestionably is correct. As the Seventh Circuit observed in *Taylor v. Quality Hyundai, Inc.,* 150 F.3d 689, 693 (7th Cir.1998), *cert. denied,* 525 U.S. 1141, 119 S.Ct. 1032, 143 L.Ed.2d 41 (1999), the notice required by the FTC Holder Rule, as a contractual provision mandated by law, "must be read in light of other laws which modify its reach." *Id.* (citing *Robbins v. Bentsen,* 41 F.3d 1195, 1198 (7th Cir.1994) ("Regulations cannot trump the plain language of statutes ....")). While the FTC Holder Rule has not been modified to limit application of the rule to cases subsequently barred by the modification to 15 U.S.C. § 1641(a), the reach of the rule unquestionably is limited by amendment of the TILA. *Taylor,* 150 F.3d at 693–94. Accordingly, plaintiffs' TILA claim against CFC is dismissed.[2]

## 3. Supplemental Jurisdiction

■ In light of the fact that the only federal claim against CFC has been dismissed, this court must consider whether to retain jurisdiction over plaintiffs' supplemental state-law claims against CFC. Pursuant to 28 U.S.C. § 1367,

> in any civil action of which the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States

---

2. CFC does not argue and this court does not hold that CFC's exemption from liability under TILA affects plaintiffs' claims under state law. *See Pawlikowski v. Toyota Motor Credit Corp.,* 309 Ill.App.3d 550, 243 Ill.Dec. 1, 722 N.E.2d 767, 773 (1999) ("The fact

that [defendant] is not liable under TILA cannot automatically translate into a finding that [defendant] did not engage in an unfair and deceptive trade practice under the Consumer Fraud Act.").

Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

*Id.* In the instant case, while the court has no jurisdiction over a federal claim against CFC, it has jurisdiction over a federal claim against Dale Baker Olds. As the language of the statute makes clear, the court may exercise jurisdiction over additional parties such as CFC whenever the claims against such parties are "so related to claims in the action within such original jurisdiction ...." *Id.* The determination whether to exercise supplemental jurisdiction over related claims turns on considerations of "judicial economy, convenience, fairness, and comity." *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254 (6th Cir.1996) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988)), *amended on denial of rhg.*, 1998 WL 117980 (6th Cir. Jan.15, 1998).

In the instant case, the claims against CFC arise out of identical facts as the claims against Dale Baker Olds. The viability of plaintiffs' claims against CFC are intricately connected with and, in fact, dependent upon the propriety and adequacy of the disclosures made to plaintiffs by Dale Baker Olds. Judicial economy, comity and convenience strongly support the exercise of supplemental jurisdiction. Moreover, the court is not persuaded that any unfairness accrues to CFC in adjudicating the claim in federal as opposed to state court. While CFC urges the unfairness of being compelled to participate in a class action when it acquired only one of the contracts of the named plaintiffs, CFC acknowledged at oral argument that it acquired eighteen or nineteen of the 400–500 agreements issued by Dale Baker Olds. Bringing plaintiffs' claims against CFC in state court will not substantially decrease CFC's exposure.

Accordingly, I am persuaded that despite dismissal of the TILA claim against CFC, this court should exercise supplemental jurisdiction over plaintiffs' state-law claims against CFC. *See King v. Crossland Sav. Bank,* 111 F.3d 251 (2d Cir.1997) (claims against issuer of travelers checks was sufficiently related to claims against bank making a false report about those checks to warrant supplemental jurisdiction); *Allendale Mut. Ins. Co. v. Triple–S Plastics, Inc.,* 851 F.Supp. 277 (W.D.Mich.1993) (state claims against security company that disconnected security and fire alarm system sufficiently related to original lawsuit against owner filed by insurers of customers damaged by fire).

### D. *Motion by CFC to Compel Arbitration and to Dismiss*

Having not prevailed on its motion to dismiss all of plaintiffs' claims for failure to state a claim, CFC moves in the alternative to compel arbitration and to dismiss the action. CFC contends that plaintiff Christian signed a retail installment contract and security agreement that contained the following arbitration provision:

> You and we agree that any claims, demands or disputes that we may have against each other shall be brought in arbitration and shall be governed by the Federal Arbitration Act, 9 U.S.C. Sections 1–16. The arbitration shall not be consolidated with any other arbitration. Judgment upon the award shall be final and binding on you and us and may be entered in any court having jurisdiction. Nothing in this agreement to arbitrate shall prevent Consumer Finance Corporation from obtaining a prejudgment, provisional or self-help remedy, such as replevin or repossession of collateral securing repayment of the Agreement, or exercising the right of offset for contractual debts owed by you.

Christian Contract, Ex. 1 to CFC's Motion to Compel Arbitration. CFC contends that the arbitration clause mandates arbitration of Christian's dispute and that this court should enforce the clause and dismiss the complaint.

Pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* The FAA reflects a "congressional declaration of a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

Federal courts apply state law to determine whether "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements . . . ." *Doctor's Assoc., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (citations omitted). In contrast, questions concerning the interpretation and construction of arbitration agreements are determined by reference to federal substantive law. *See Moses H. Cone*, 460 U.S. at 25 n. 32, 103 S.Ct. 927 (1983); *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 179 (3d Cir.1999).

Plaintiffs assert that the arbitration clause of the contract is unconscionable under Michigan law. In Michigan, to prove that the arbitration clause is unconscionable, plaintiffs must demonstrate that the provision is both procedurally and substantively unconscionable. *See Morris v. Metriyakool*, 418 Mich. 423, 440, 344 N.W.2d 736, 742 (1984); *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 322 (1998). Under Michigan law, unconscionability is a question of law for the court to decide. *Id.*

### 1. Procedurally unconscionable

In order to determine whether a contract is procedurally unconscionable, the court typically considers the relative bargaining power of the parties, their relative economic strength, the alternative sources of supply, "in a word, what are their options?" *Morris*, 418 Mich. at 440, 344 N.W.2d 736. Having reviewed the verified allegations of the complaint, I am persuaded that plaintiffs have adequately alleged that inclusion of the arbitration provision was procedurally unconscionable.

In their complaint, plaintiffs allege that at the time of signing, Christian, like other consumers managed by the special finance department, was hurried to sign and had no reasonable opportunity to review the agreement. *See* Complaint ¶ 77. The complaint further alleges that Dale Baker Olds did not provide a copy of the contract to Christian at the time of signing. In fact, Christian was not given copies of any paperwork until two weeks after he had signed and after financing had been finalized through CFC. *See* Complaint ¶ 58. Plaintiffs further allege that such treatment resulted from the admitted practice of the special finance department to refuse to provide the customer with a copy of the retail installment contract until the contract had been purchased from Dale Baker Olds by a third-party finance company. *See* Complaint ¶¶ 27–30, 65, 73, 79. As a consequence of both circumstances, plaintiffs contend that Christian did not and could not freely accept the arbitration provision.

I conclude that plaintiff has adequately alleged that the arbitration provision at issue was procedurally unconscionable. *See Ryoti v. Paine, Webber, Jackson & Curtis, Inc.*, 142 Mich.App. 805, 809, 371 N.W.2d 454, 455 (1985) (holding that factual question was presented whether arbitration agreement was procedurally unconscionable because adhesive). Where a contract is prepared by one party and offered for rejection or acceptance without opportunity for bargaining under circumstances in which the party cannot obtain the desired product or service except by acquiescing in the form agreement, Michigan courts will conclude that the contract is adhesive and therefore procedurally unconscionable. *See id.; Morris*, 418 Mich. at 440, 344 N.W.2d at 742 (but holding that arbitration agreement at issue in that case was not adhesive); *Allen v. Michigan Bell*

*Tel. Co.,* 18 Mich.App. 632, 637, 171 N.W.2d 689 (1969) ("Implicit in the principle of freedom of contract is the concept that at the time of contracting each party has a realistic alternative to acceptance of the terms offered"); *Northwest Acceptance Corp. v. Almont Gravel, Inc.,* 162 Mich.App. 294, 302–03, 412 N.W.2d 719 (1987) (leases presented to a plaintiff for signature during a 45–minute meeting which took place at a restaurant were unconscionable where the plaintiff had no "opportunity to read, study or consult in regards to the deal.").

Pursuant to the allegations in the complaint, the special financing department of Dale Baker exists to make auto loans through the sub-prime market to consumers like Christian who, because of their credit histories, were not eligible for financing in the primary credit market. *See* Complaint, ¶ 74. As a result, the underlying circumstances alleged in the complaint necessarily involved consumers who had few options in obtaining credit.

For similar reasons, the allegations also support a conclusion that the parties had highly unequal bargaining power. Plaintiffs were consumers with few financing options dealing with an experienced sales dealership. As the courts have recognized, "the notion of unconscionability is most frequently employed to shield disadvantaged and uneducated consumers from overreaching merchants." *Johnson v. Mobil Oil Corp.,* 415 F.Supp. 264, 266 (E.D.Mich.1976).

In addition, the verified complaint alleges that Dale Baker's special finance department did not allow time to carefully review the contract, but rushed plaintiffs to sign. Moreover, the gravamen of the complaint is that Christian and the other plaintiffs were not permitted to have copies of their contract documents either before or after signing until the contract had been purchased in the secondary lender market. Christian specifically alleges that he did not receive a copy of his transaction documents until two weeks after he had signed. Such practices unquestionably allege procedural unconscionability.

Further, the consumer protection statutes under which this action was brought were specifically designed to protect unsophisticated consumers from unscrupulous creditors. *See, e.g.,* 15 U.S.C. § 1601(a) (declaring that part of purpose of TILA was "to protect the consumer against inaccurate and unfair credit billing and credit card practices."); H. Rep. No. 1040, *reprinted in* 1968 U.S.Code Cong. & Admin. News, at 1962, 1975 (noting need for protection of unsophisticated consumers from unscrupulous merchants or lenders); Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903(1)(t) (providing that it is unfair, unconscionable, deceptive and unlawful to enter "into a consumer transaction in which the consumer waives or purports to waive a right, benefit, or immunity provided by law unless the waiver is clearly stated and the consumer has specifically consented to it."). A party seeking to remedy a contract's failure to comply with legislation designed in part to prevent unconscionable contracts has articulated a sound basis for asserting procedural unconscionability.

Finally, while print size alone would not warrant a finding of procedural unconscionability, the fact that the arbitration clause was written in the smallest print on the front of the contract is somewhat suggestive of procedural unconscionability. *See Powertel, Inc. v. Bexley,* 743 So.2d 570, 575 (Fla.App.1999) (noting that method of disclosure may affect finding of procedural unconscionability); *cf. Harris v. Green Tree Financial Corp.,* 183 F.3d 173, 182 (3d Cir.1999) (rejecting finding that arbitration clause was procedurally unconscionable, but noting Pennsylvania precedent that where parties have unequal bargaining power, inconspicuous or unclear language may ground claim of procedural unconscionability).

Taken together, I find that plaintiffs have sufficiently alleged procedural uncon-

scionability in the formation of the agreement to arbitrate.

## 2. Substantively unconscionable

 Even if a contract is procedurally unconscionable, however, "the challenged term is still enforceable if substantively reasonable and not oppressive or unconscionable." *Andersons,* 166 F.3d at 323. Determination of whether a contract provision is substantively unconscionable rests on whether the provision is substantively reasonable. *Andersons,* 166 F.3d at 323; *Paulsen v. Bureau of State Lottery,* 167 Mich.App. 328, 336, 421 N.W.2d 678, 682 (Mich.App.1988).

Courts routinely have recognized that arbitration may bring hardships for litigants along with potential efficiency. *Randolph v. Green Tree Fin. Corp.,* 178 F.3d 1149, 1157 (11th Cir.1999) (citing *Paladino v. Avnet Computer Tech., Inc.,* 134 F.3d 1054, 1062 (11th Cir.1998)). As a result, not all hardships imposed by arbitration will be unreasonable. "In light of the 'strong federal policy favoring arbitration,' some 'inherent weaknesses' in the procedural apparatus of an arbitration 'should not make an arbitration clause unenforceable.'" *Id.* The Supreme Court has held that "so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 28, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991).

Nevertheless, the Supreme Court has recognized the potential for arbitration agreements to defeat the remedial and deterrent functions of a statute. See *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 637, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). In such circumstances, the Court has concluded that Congress will demonstrate its intent that a given statute not be subject to waiver of the right to judicial forum either in the text of the statute or its legislative history. *Id.* at 628, 105 S.Ct. 3346. The Court also has recognized that such intent may also be "deducible from ... an inherent conflict between arbitration and the statute's underlying purposes." *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 227, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987).

In *Rembert v. Ryan's Family Steak Houses, Inc.,* 235 Mich.App. 118, 596 N.W.2d 208, 225 (Mich.App.1999), a special conflicts panel of the Michigan Court of Appeals analyzed the reach of the Supreme Court's decisions regarding the reasonableness of agreements to arbitrate in the context of an employee agreement to arbitrate statutory civil rights laws. See *id.* (analyzing *Gilmer,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26; *Mitsubishi Motors,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444; *McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185; and *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)). The *Rembert* court acknowledged the existence of a liberal policy favoring arbitration agreements. *Id.* The Rembert court concluded that, in ordinary circumstances, the federal policy to enforce arbitration agreements applied, even in the context of claims founded on statutory rights. *Rembert,* 596 N.W.2d at 216. The court recognized, however, that the Supreme Court had clearly indicated that to be enforceable, arbitration agreements nevertheless must permit the effective vindication of those statutory rights so that the statute will continue to serve both its remedial and deterrent functions. Id. at 217.

 Applying these principles, the *Rembert* court concluded that to be enforceable and reasonable, an arbitration agreement must meet three elements: (1) the parties must have agreed to arbitrate the claims (there must be a valid, binding contract governing the statutory claims in issue); (2) the statute involved must not prohibit such agreements; and (3) the arbitration agreement must not waive the

substantive rights and remedies of the statute and the arbitration procedures must be fair so that the employee may effectively vindicate his statutory rights. *Id.* at 226. The court held that the first prong of the test required the court to determine both whether the contract is an adhesion contract to which the party had no meaningful choice and whether the contract is substantively fair. These two elements constitute the two prongs of a determination of conscionability. *See id.* at 226 & n. 28. The *Rembert* court concluded that if the remaining prongs of the test were met, that is whether the provision "preserves substantive rights and remedies and is procedurally fair," the contract was substantively reasonable and therefore conscionable. *Id.* at 226 n. 28.[3]

In *Rembert*, the court carefully evaluated what minimum standards were required to determine whether an arbitration agreement was sufficiently procedurally fair to permit vindication of statutory rights. The court held that "to be valid, a predispute agreement to arbitrate must not waive rights under the statute and must be fair." *Id.* at 227. The *Rembert* court held that to be fair under this definition, the agreement must contain the following minimal procedural protections: (1) clear notice, (2) right to counsel, (3) reasonable discovery, (4) a fair hearing, and (5) a neutral arbitrator. *See id.* at 228. The court held that an arbitration agreement which waived statutory rights or remedies or failed to meet these requirements of procedural fairness was not substantively reasonable and therefore not conscionable. *Id.* at 226 n. 28.

While the *Rembert* decision specifically addressed agreements to arbitrate state

civil rights laws, the principles generated by the *Rembert* court and the application of Supreme Court precedent are useful in evaluating whether the arbitration agreement in the instant case is substantively conscionable. As the *Rembert* court acknowledged, however, evaluation of particular arbitration agreements is fact specific. *See id.* at 227 n. 30 ("The endless variety in the nature of businesses, the sophistication of employees, and the types of disputes that may be arbitrated persuade us that we cannot and should not promulgate a blueprint for all arbitrations.").

Plaintiffs raise several grounds upon which they contend the provision is substantively unreasonable and therefore unconscionable. They argue that the agreement is substantively unconscionable because it fails to address the payment of filing fees or the apportionment of the costs of arbitration. They also contend that the arbitration provision is not mutual and therefore not enforceable. Finally, they assert that the arbitration clause limits the remedies available under law, including the availability of declaratory, injunctive and class relief, and therefore is unconscionable.[4]

### a. *Arbitration costs*

The arbitration clause at issue in this case makes no provision for the payment of arbitrator costs. Plaintiffs contend that, especially in light of the small amounts in issue for individual claims under the statutes involved in this litigation, the absence of some provision limiting costs effectively prevents the use of the arbitral forum to vindicate rights.

---

**3.** The *Rembert* court added that even if a contract is not adhesive and procedurally unconscionable, it nevertheless would be unenforceable if not fair and reasonable under the remainder of the test. *Id.*

**4.** Because of my resolution of plaintiffs' other assertions of unconscionability, I need not address the question of mutuality. I observe, however, that the Sixth Circuit has rejected

the notion that arbitration clauses must be mutual to be enforceable. *See Wilson Elec. Contractors, Inc. v. Minnotte Contracting Corp.*, 878 F.2d 167, 169 (6th Cir.1989) (rejecting notion that arbitration clause requires separate consideration, but acknowledging that plaintiff did not assert that the contract was unconscionable).

A number of courts have recognized that an arbitration provision imposing substantial arbitration costs is unenforceable because it prevents the arbitration from serving as an effective and accessible alternative forum. *See Randolph,* 178 F.3d at 1157 (citing *Paladino,* 134 F.3d at 1062 (11th Cir.1998)) (failure to limit arbitration costs makes arbitration agreement unreasonable); *Baron v. Best Buy Co., Inc. ("Baron I"),* 75 F.Supp.2d 1368, 1370–71 (S.D.Fla.1999) (holding that provision splitting attorney fees and failure to provide limitation on arbitration expense to consumer made arbitration clause unenforceable under TILA); *Baron v. Best Buy Co., Inc. ("Baron II"),* 79 F.Supp.2d 1350, 1354–55 (S.D.Fla.1999) (reiterating that "arbitration agreement which limits or precludes statutory remedies, or which possibly makes an individual responsible for arbitration fees and costs, is unenforceable."). *See also Cole v. Burns Int'l Sec. Serv.,* 105 F.3d 1465, 1482 (D.C.Cir.1997) (holding in context of federal employment claims, that to be enforceable, arbitration agreements must not require employees either to pay unreasonable costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum); *Shankle v. B–G Maintenance Management of Colorado, Inc.,* 163 F.3d 1230, 1235 (10th Cir.1999). *But see Dorsey v. HCP Sales, Inc.,* 46 F.Supp.2d 804, 808 (N.D.Ill.1999) (consumer may not avoid arbitration agreement by complaining of costs); *Rhode v. E & T Investments, Inc.,* 6 F.Supp.2d 1322, 1328 (M.D.Ala.1998) (arbitration provision not unconscionable under Alabama law because it fails to limit arbitration costs).

In Michigan, the Court of Appeals has declined to recognize that the failure of an arbitration agreement to mandate that the employer pay arbitrator fees renders an employment arbitration agreement unreasonable *Rembert,* 235 Mich.App. 118, 596 N.W.2d 208, 225 (in employment disputes, arbitration agreement valid despite no provision limiting arbitrator's fees, but noting existence of Michigan court rules which

permitted shifting of fees). Nevertheless, while the *Rembert* court declined to require the inclusion of a limitation-of-fees provision in its list of minimal procedural requirements in an employment dispute, I question whether in a consumer case, where the size of individual claims is small, the failure to limit costs would prevent the vindication of statutory causes of action. *See Rembert,* 596 N.W.2d at 225, 230 (holding that to be fair, arbitration agreements must not waive rights or remedies under the statute and must meet minimum fair procedural requirements). The *Rembert* court specifically noted that fairness of arbitration agreements is a particularized inquiry and that the *Rembert* analysis was not intended to be applied as a system of blanket rules. *See id.* at 227 n. 30. As a consequence, despite the holding of the Rembert court with respect to employment cases, I am satisfied that the Michigan Supreme Court would not follow that reasoning as applied to consumer protection statutes.

I need not affirmatively decide the issue, however, because it is clear to me that the waiver of class remedy contained in the arbitration clause, as well as the clause's failure to provide for declaratory and injunctive relief, violates the requirements of reasonableness set forth in *Rembert* and is therefore substantively unconscionable.

### b. *Waiver of class relief*

 Plaintiffs argue that the arbitration provision is substantively unconscionable because the arbitration of claims arising under the TILA would violate Congressional intent to allow and encourage the enforcement of TILA through class relief. They therefore assert that the waiver of judicial forum violates the underlying purposes of TILA.

A few courts have held that arbitration clauses are unenforceable as to TILA claims because they contravene the clear Congressional intent to encourage compliance with TILA through availability of

class actions. See *Johnson v. Tele–Cash, Inc.*, 82 F.Supp.2d 264, 270 (D.Del.1999) (holding that inherent conflict existed between TILA right to class action and arbitration clause and refusing to enforce); *Baron I*, 75 F.Supp.2d at 1370–71 (holding that arbitration clause that defeats purpose of TILA is unenforceable); *Powertel*, 743 So.2d at 573 (prohibition on class relief renders arbitration agreement unenforceable under TILA); cf. *Bantolina v. Aloha Motors, Inc.*, 419 F.Supp. 1116, 1120 (D.Haw.1976) (recognizing that Congress concluded that class actions were "necessary to elevate truth-in-lending lawsuits from the ineffective 'nuisance category' to the type of suit which has enough sting to insure that management will strive with diligence to achieve compliance.") (quoting Federal Reserve Board, 1972 Annual Report on Truth in Lending). The Northern District of Illinois, in contrast, has on several occasions rejected the contention that waiver of class relief undermines the remedial purpose of TILA, holding that Congressional intent to encourage class actions is not sufficiently clear to override general policy of encouraging arbitration established by the FAA. *See Lopez v. Plaza Fin. Co.*, No. 95–C–7567, 1996 WL 210073, at *2–3 (N.D.Ill. April 25, 1996); *Thompson v. Illinois Title Loans, Inc.*, No. 99C 3952, 2000 WL 45493 (N.D. Ill. Jan. 11, 2000) (citing *Lopez* and subsequent cases in Northern District of Illinois) (citations omitted).

My review of these cases suggests that the thorough discussion in *Johnson* is more complete and persuasive than that of *Lopez*, and that the remedial purposes of TILA are substantially defeated or impaired by arbitration clauses such as the clause in this case. Moreover, the *Rembert* court clearly held that arbitration agreements that waive statutory rights or

remedies are not substantively reasonable under Michigan law. See *Rembert*, 596 N.W.2d at 230 (arbitration agreement not enforceable where it waives any rights or remedies under the statute).

Further, even if the waiver of judicial forum was not substantively unconscionable with respect to TILA claims, under the Michigan Consumer Protection Act, the availability of class recovery is explicitly provided for and encouraged by statute. See Mich. Comp. Laws § 445.911(3) (expressly permitting aggrieved person to bring class action for claims brought pursuant to the MCPA). Because the arbitration agreement prohibits the pursuit of class relief, it impermissibly waives a state statutory remedy. *See Rembert*, 596 N.W.2d at 230.

██ I also note that both the TILA and the MCPA expressly provide for the availability of injunctive and declaratory relief. By failing to confer on the arbitrator the authority to provide such relief, and by limiting the arbitrator's authority to individual claims, the arbitration clause fails to meet the test of reasonableness under *Rembert*. See id. at 230 (no waiver of rights or remedies permitted).[5]

Taken together, both federal and Michigan case law support a conclusion that an arbitration provision is substantively unconscionable because it waives class remedies, as well as declaratory and injunctive relief. Because the arbitration clause impermissibly waives statutory remedies, I conclude that under Michigan law, the arbitration provision is substantively unconscionable because not reasonable. I therefore deny CFC's motion to compel arbitration and to dismiss.

**III.**

For the foregoing reasons, the motion of Dale Baker Olds to dismiss (docket # 17)

---

5. Moreover, other Michigan decisions governing substantive unconscionability emphasize that the contract must adequately and clearly disclose that contractual provisions alter significant statutory rights. See *Martin v. Joseph Harris, Co., Inc.*, 767 F.2d 296, 301 (6th Cir. 1985) (waiver must be clear and express). The arbitration provision at issue here makes no disclosures concerning the limitations on remedies. Indeed, the provision fails to state that the consumer waives either remedy or forum.

is **DENIED.** In addition, the motion of CFC to dismiss (docket # 7) is **GRANTED** in such part as plaintiffs' TILA claim (Count 1) is **DISMISSED WITH PREJUDICE** against defendant CFC. The remainder of CFC's motion to dismiss is **DENIED.** The alternative motion of CFC to compel arbitration (docket # 8) is **DENIED.**[6]

### ORDER

In accordance with the opinion filed this date,

**IT IS ORDERED** that the motion of Dale Baker Olds to dismiss (docket # 17) is **DENIED.**

**IT IS FURTHER ORDERED** that the motion of CFC to dismiss (docket # 7) is **DENIED,** except as to plaintiffs' TILA claim (Count 1) against CFC. As to that claim, CFC's motion is **GRANTED** and the TILA claim against CFC is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that the alternative motion of CFC to compel arbitration (docket # 8) is **DENIED.**

**IT IS FURTHER ORDERED** that within ten (10) days of the date of this order defendants shall answer—or plaintiffs shall withdraw—plaintiffs' motion to compel discovery (docket # 46).

---

6. Also pending in this matter is plaintiffs' motion to compel discovery of Dale Baker Oldsmobile (docket # 46). It was the court's understanding at the time of oral argument on the motions to dismiss that the parties had reached an understanding and that the motion was moot. The motion has neither been answered nor withdrawn. Within 10 days of the date of this opinion, defendants shall answer or plaintiffs shall withdraw the motion.