**STADIUM CHRYSLER JEEP, L.L.C., a domestic limited liability company of New Jersey; Teterboro Chrysler Plymouth, Inc. d/b/a/ Teterboro CPJ; Kobbe & Flannery, Inc., d/b/a/ Tenafly Jeep Eagle Chrysler Plymouth; Wyckoff Chrysler Plymouth, Inc.; and Fleetway Chrysler Plymouth, Inc., Plaintiffs,**

v.

**DAIMLERCHRYSLER MOTORS COMPANY, LLC, a Delaware limited liability company, Defendant.**

Civil Action No. 02–5345 (JAP).

United States District Court, D. New Jersey.

July 14, 2004.

Bressler, Amery & Ross, PC, Eric L. Chase, Esq., Florham Park, NJ, for Plaintiffs, Stadium Chrysler Jeep, L.L.C.; Teterboro Chrysler Plymouth, Inc. d/b/a/ Teterboro CPJ; Kobbe & Flannery, Inc., d/b/a/ Tenafly Jeep Eagle Chrysler Plymouth; Wyckoff Chrysler Plymouth, Inc.; and Fleetway Chrysler Plymouth, Inc.

Hale and Dorr LLP, George W. Mykulak, Esq., Princeton, NJ, for Defendant, DaimlerChrysler Motors Company, LLC.

## OPINION

PISANO, District Judge.

Before the Court are cross-motions for summary judgment filed by the Plaintiffs, Stadium Chrysler Jeep, L.L.C. ("Stadium"); Teterboro Chrysler Plymouth, Inc. d/b/a/ Teterboro CPJ ("Teterboro"); Kobbe & Flannery, Inc., d/b/a/ Tenafly Jeep Eagle Chrysler Plymouth ("Tenafly"); Wyckoff Chrysler Plymouth, Inc. ("Wyckoff"); and Fleetway Chrysler Plymouth, Inc. ("Fleetway") (collectively the "Plaintiffs") and Defendant DaimlerChrysler Motors Company, LLC ("DaimlerChrysler" or the "Defendant") pursuant to Federal Rule of Civil Procedure 56.

The Plaintiffs' complaint (the "Complaint") alleges violations of the New Jersey Franchise Practices Act, N.J.S.A. §§ 56:10–13 (Count I), and 10–7 and 13.4 (Count II); violation of the Automobile Dealer's Day in Court Act, 15 U.S.C. §§ 1221–25 (Count III); and common law breach of contract (Count IV), breach of the implied covenant of good faith and fair dealing (Count V), and unjust enrichment (Count VI). The Defendant timely filed its answer.

The Court has jurisdiction to consider this matter under 28 U.S.C. § 1331 with

respect to Count III, and 28 U.S.C. § 1332 with respect to the remaining state law claims. The Court heard oral argument on March 29, 2004, and for the reasons set forth below, the Court grants summary judgment for the Plaintiffs in part, and for the Defendant in part.

## I. BACKGROUND

This case involves the termination of the Plymouth brand of automobiles, which were marketed, manufactured, and distributed by Defendant DaimlerChrysler until September 30, 2001. Before the termination, each of the Plaintiffs had entered into Plymouth Sales and Service Agreements (each referred to as an "SSA"), and each were authorized dealers of Plymouth vehicles. Defendant's Local Civil Rule 56.1 Statement of Undisputed Facts, referred to herein as "Def.'s 56.1 Stmt." at ¶¶ 12, 19, 35, 42, 53; Plaintiffs's Local Civil Rule 56.1 Statement, referred to herein as "Pls.'s 56.1 Stmt." at ¶¶ 15, 17, 19, 21, 23. The SSA's expressly incorporate standard Additional Terms and Provisions ("Additional Terms"). Certification of George Mykulak ("Mykulak Cert.") Appendix ("App.") F, Engelsdorfer Ex. 12; Certification of Jason M. Schoenberg ("Schoenberg Cert.") Ex. J at ¶ 5; Def.'s 56.1 Stmt. at ¶ 5; Compl. at ¶ 17. The Additional Terms provide that "[i]n the event of a dispute hereunder, the terms of this Agreement shall be construed in accordance with the laws of the State of Michigan." Mykulak Cert.App. F at ¶ 42.

Paragraph 27 of the Additional Terms provides in pertinent part: "[DaimlerChrysler] at any time may discontinue any or all models, lines or body styles and may revise, change or modify their construction or classification.... [DaimlerChrysler] at any time may declare obsolete or discontinue any or all parts, accessories and other merchandise." Mykulak Cert.App. F at

¶ 27. Paragraph 28 governs termination of the franchise relationship, and expressly provides that the SSA "will terminate automatically without notice from either party on . . . the discontinuance by [DaimlerChrysler] of the production or distribution of all [DaimlerChrysler] vehicles listed on the Motor Vehicle Addendum," id. at ¶ 28(c)(v), which, according to DaimlerChrysler, "identifies the line-make sold under the particular [SSA]," Def.'s 56.1 Stmt. at ¶ 7. The Additional Terms also contain DaimlerChrysler's repurchase obligations, which pertain to repurchase of new, unused, and unsold specified vehicles, parts, accessories, special tools, and signs in the event of a termination. Mykulak Cert. App. F at ¶ 29.

Beginning in the fall of 1999, DaimlerChrysler publicly announced "its decision to discontinue the Plymouth brand on a nationwide basis in late 2001, with the end of 2001 model year production." Def.'s 56.1 Stmt. at ¶ 55; see also Pls.'s 56.1 Stmt. at ¶ 25. At that point in time, the Plymouth product-line consisted of five automobiles: the Neon subcompact economy car, the Breeze mid-size sedan, the Voyager and Grand Voyager minivans, and the Prowler Roadster. Def.'s 56.1 Stmt. at ¶ 56. "DaimlerChrysler tied its decision to discontinue the remaining Plymouth models to a concurrent expansion of the Chrysler brand." Id. at ¶ 59. To this end, in 2000, DaimlerChrysler began "transitioning all existing Plymouth models but one into the Chrysler brand...." Id. at 70. Under this transition plan, Neon would be the only remaining Plymouth as of the effective date of the discontinuation, and then it would become an exclusive Dodge model. Id.

In connection with the termination of Plymouth, "DaimlerChrysler developed a compensation plan to offer to terminated Plymouth dealers that would provide them

the option of accepting lump sum compensation payments in lieu of returning vehicles, parts and tools." Def.'s 56.1 Stmt. at ¶ 81. DaimlerChrysler informed Plymouth dealers of the compensation plan in two separate August 2001 mailings. *Id.* at ¶ 83. On or about August 13, 2001, DaimlerChrysler issued letter which acknowledged to Plymouth dealers that individual sales and service agreements imposed repurchase obligations upon it in connection with the discontinuance, and that state law may modify those obligations. *Id.* at ¶ 83(A); Pls.'s 56.1 Stmt. at ¶¶ 26–27; Schoenberg Cert. Ex. Z (Aug. 13, 2001 letter). With the August 13 mailing, DaimlerChrysler included a sample copy of the Plymouth Discontinuance Repurchase/Compensation Agreement (the "Discontinuance Agreement"). Def.'s 56.1 Stmt. at ¶ 83(A); Pls.'s 56.1 Stmt. at ¶ 26.

On or about August 30, 2001, DaimlerChrysler issued a letter which detailed the various options of Plymouth dealers ("Repurchase Instruction Letter"). Def.'s 56.1 Stmt. at ¶ 83(B); Pls.'s 56.1 Stmt. at ¶¶ 28–29; Schoenberg Cert. Ex. AA (Aug. 30, 2001 letter). The Repurchase Instruction Letter stated that

> [e]ssentially, the Plymouth Discontinuance Repurchase/Compensation Agreement provides that [DaimlerChrysler] will offer [Plymouth dealers] the option to either receive a one-time compensation payment of three thousand and 00/100 ($3,000) dollars for each eligible new, unused, unsold and undamaged Plymouth vehicle in your inventory (other than Plymouth Prowlers), or you may request [DaimlerChrysler] to repurchase all eligible 2001 model Plymouth vehicles, unless otherwise required under state law.

Schoenberg Cert. Ex. AA at 1. Plymouth dealers were also offered a lump-sum compensation payment of five thousand dollars ($5,000) in lieu of "repurchase of eligible unique Plymouth parts and accessories under the terminated Plymouth Agreement," and three thousand dollars ($3,000) in lieu of the repurchase of any Plymouth special tools. *Id.* The Repurchase Instruction Letter also indicated that acceptance of lump sum compensation required release of all other claims against DaimlerChrysler for compensation relating to the discontinuance of Plymouth. Def.'s 56.1 Stmt. at ¶ 85; Pls.'s 56.1 Stmt. at ¶¶ 29–30; Schoenberg Cert. Ex. Z at 3. "Specifically excluded from this release are (1) amounts owing by [DaimlerChrysler] to DEALER as the result of this agreement, and (2) amounts that may be owing by [DaimlerChrysler] to DEALER in the ordinary course of business...." Schoenberg Cert. Ex. Z. At 3.

On or about September 30, 2001, the effective date of the termination, Plymouth was officially discontinued. Def.'s 56.1 Stmt. at ¶ 93; Pls.'s 56.1 Stmt. at ¶ 31. By this time, DaimlerChrysler had expanded their Chrysler and Dodge lines to include discontinued Plymouth models. Def.'s 56.1 Stmt. at ¶ 93.

The liability and damages phases of this litigation have been bifurcated, and at this stage, the only issues before the Court relate to liability. Any arguments of counsel that involve damages will not be addressed by the Court.

## II. LEGAL DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter

of law." Fed.R.Civ.P. 56(c). On a motion for summary judgment, the moving party must first show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party. *Healy v. N.Y. Life Ins. Co.,* 860 F.2d 1209, 1219 n. 3 (3d Cir.1988). "The substantive law governing the dispute will determine which facts are material and only disputes over those facts 'that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Simmerman v. Corino,* 804 F.Supp. 644, 649 (D.N.J.1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

If the moving party can show that no genuine issue of material fact exists, the burden then shifts to the non-moving party to present evidence that a genuine issue of fact exists. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. In determining whether a genuine issue of material fact exists, the Court must view the facts in the light most favorable to the non-moving party and extend all reasonable inferences to that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Stephens v. Kerrigan,* 122 F.3d 171, 176–177 (3d Cir. 1997). In making this determination, the Court shall not "weigh the evidence and determine the truth of the matter," but only needs to determine whether a genuine issue necessitates a trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In order to satisfy this standard, however, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts...." *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. 1348 (citations omitted). Instead, the non-moving party must prove beyond a "mere scintilla" of evidence that a genuine issue of material fact exists. *Big Apple BMW v. BMW of N. Am.,* 974 F.2d 1358, 1363 (3d Cir.1992). In addition, "a party cannot rely upon self-serving conclusions, unsupported by specific facts in the record." *LaResca v. Am. Tel. & Tel.,* 161 F.Supp.2d 323, 327 (D.N.J.2001) (citing *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548).

**B. New Jersey Franchise Practices Act—Counts I and II**

Originally enacted in 1971, the New Jersey Franchise Practices Act (the "NJFPA" or the "Act") imposes obligations upon a motor vehicle franchisor and franchisee in the event of termination or modification of the franchise relationship. N.J.S.A. 56:10–1 through 10–15. Under the NJFPA, a "franchise" is defined as "a written arrangement ... in which a person grants to another person a license to use a trade name, trade mark, service mark, or other related characteristics, and in which there is a community of interest in the marketing of goods or services...." N.J.S.A. 56:10–3(a). A "franchisor" is "a person who grants a franchise to another person;" a "franchisee" is "a person to whom a franchise is offered or granted." N.J.S.A. 56:10–3(c), (d). Section 10–13 further defines a "motor vehicle franchise" as "a franchise for the marketing of new motor vehicles." N.J.S.A. 56:10–13. A "motor vehicle franchisor" is defined as "a franchisor engaged in the business of manufacturing or assembling new motor vehicles, who will, under normal business conditions during the year, manufacture or assemble at least 10 motor vehicles, and his motor vehicle distributors." *Id.* Similarly, a "motor vehicle franchisee means every franchisee actively engaged in the business of buying, selling or exchanging new motor

vehicles who has an established business." *Id.*

Under the NJFPA, it is a violation for a franchisor to terminate a franchise "without good cause." N.J.S.A. 56:10–5. However, 1991 amendments to the Act, which were effective January 18, 1992, more specifically defined the obligations of motor vehicle franchisors, and replaced the good cause inquiry in the event of a termination of the franchise. These amendments included passage of sections 13.2 through 13.4, the principal statutory provisions being disputed before this Court. NJFPA section 13.4 provides in pertinent part that

the termination, cancellation or *discontinuation of a series, line, brand or class of new motor vehicle marketed by a motor vehicle franchisor as a distinct series, line, brand, or class shall be deemed to be the termination, cancellation or nonrenewal of the motor vehicle franchise* of a motor vehicle franchise of a motor vehicle franchisee holding a franchise which includes that series, line, brand or class, even if that series, line, brand, or class of new motor vehicle is part of a motor vehicle franchise which includes other series, lines, brands, or classes of new motor vehicles.

N.J.S.A. 56:10–13.4 (emphasis added). The section further states that

[n]otwithstanding the provisions of this section, a franchisor may change, add or delete models, specifications, model names, numbers or identifying marks or similar characteristics of the new motor vehicles it markets, *if those changes, additions or deletions do not result, directly or indirectly, in the termination, cancellation or discontinuation of a distinct series, line, brand or class of new motor vehicle.*

*Id.* (emphasis added).

Where termination occurs "as a result of a termination or cessation of a part of the franchisor's business operations throughout the United States, which is not any part of any change in the ownership, operation or control of all or any part of the franchisor's business," the NJFPA imposes repurchase obligations on the franchisor, which includes the repurchase of unused, undamaged an unsold inventory, and special tools and signs required by the franchisor. N.J.S.A. 56:10–13.2. Other terminations of motor vehicle franchises trigger the payment obligations of section 56:10–13.3(b), which includes payment of an amount that is at least equivalent to the fair market value of the motor vehicle franchise. N.J.S.A. 56:10–13.3(b).

The legislative history to the 1991 amendments states that

[t]he bill makes it clear that the removal or elimination of one or more lines or makes of vehicles under a single franchise agreement is nevertheless a termination of the franchise. Some franchisors evade the present requirements of the "Franchise Practices Act" by canceling only a part of the agreement. For example, some franchisors grant the right to sell two or more lines of vehicles (light and heavy trucks) under a single agreement and then subsequently remove one or more lines while leaving others in place. Under the bill, such action would be treated as a termination of the franchise.

Bill No. S.3486, Sponsor Statement at 6:2–11.

The NJFPA also prohibits other conduct in the relationship between motor vehicle franchisee and franchisor. In particular, section 10–7.4 of the NJFPA makes it a violation of the Act for a motor vehicle franchisor "[t]o require an unconditional release from a motor vehicle franchisee without permitting the franchisee to except from the release any claims for out-

standing financial obligations of the motor vehicle franchisor to the motor vehicle franchisee for which payment will not be made at or before the giving of the release." N.J.S.A. 56:10–7.4(f).

### C. The Automobile Dealer's Day in Court Act—Count III

■ The Automobile Dealer's Day in Court Act ("ADDCA"), 15 U.S.C. §§ 1221–25, "is a remedial statute enacted to redress the economic imbalance and unequal bargaining power between large automobile manufacturers and local dealerships, protecting dealers from unfair termination and other retaliatory and coercive practices." *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 92 (3d Cir. 2000). The ADDCA authorizes a dealer to bring a civil action against automobile manufacturers engaged in commerce where the manufacturer has failed "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer...." 15 U.S.C. § 1222.

■ In order to make out a claim under the ADDCA, a plaintiff must demonstrate that: (1) it is an automobile dealer; "(2) the defendant must be an 'automobile manufacturer' engaged in commerce; (3) there must be a manufacturer-dealer relationship embodied in a written franchise agreement; and (4) the plaintiff must have been injured by the defendant's failure to act in good faith." *Id.* at 93. "Good faith" is defined by the ADDCA as

the duty of each party to any franchise ... to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute lack of good faith.

15 U.S.C. 1221(e) (italics in original). The duty of good faith under the ADDCA is to be given narrow construction, and requires actual, or threatened, coercion or intimidation. *Northview Motors,* 227 F.3d at 93. "[I]f an ADDCA defendant has objectively valid reasons for terminating its relations with a dealer, the dealer cannot prevail in an ADDCA action absent evidence that the Defendant had an ulterior motive for its action." *Id.* at 94. "[T]he type of coercion or intimidation rendered actionable by the ADDCA occurs only when the manufacturer works a 'wrongful demand which will result in sanction if not complied with.'" *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 304 (3d Cir.2001).

### D. Breach of Contract—Count IV

■ "[U]nder Michigan law [1], the essential elements of a breach of contract claim are: 1) the existence of a contract between the parties, 2) the terms of the contract, 3) that defendant breached the contract, and 4) that the breach caused the plaintiff injury." *Timmis v. Sulzer Intermedics, Inc.*, 157 F.Supp.2d 775, 777 (E.D.Mich.2001) (quoting *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir.1999)).

---

1. Paragraph 42 of the Additional Terms provides that Michigan law is to govern disputes arising under the SSA. Mykulak Cert.App. F at ¶ 42. New Jersey gives effect to contracting parties' private choice of law clauses unless they conflict with New Jersey public policy. *See New A.C. Chevrolet,* 263 F.3d at 331 fn. 21 (citing *Instructional Sys., Inc. v. Com-* puter Curriculum Corp., 130 N.J. 324, 341, 614 A.2d 124 (N.J.1992)). The Court finds that there is no such conflict, *see Instructional Sys.,* 130 N.J. at 341–42, 614 A.2d 124, and will give effect to the contracting parties' choice. The Court therefore applies Michigan law to the Plaintiffs's contract and quasi-contract claims, Counts IV through VI.

*E. Breach of the Implied Covenant of Good Faith and Fair Dealing— Count V*

 Under Michigan law, an implied covenant of good faith only exists in certain circumstances. *New A.C. Chevrolet,* 263 F.3d at 333 (interpreting and applying Michigan law). "Specifically, two principles supply the framework for analyzing whether a contractual provision gives rise to an implied covenant of good faith." *Id.*

First, under Michigan law, "[w]here a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith." At the same time, "Michigan law does not imply the good faith covenant here parties have 'unmistakably expressed their respective rights.' "

*Id.* at 333–34 (quoting *Burkhardt v. City Nat'l Bank of Detroit,* 57 Mich.App. 649, 226 N.W.2d 678, 680 (1975)). "The implied covenant of good faith and fair dealing essentially serves to supply limits on the parties' conduct when their contract defers decision on a particular term, omits terms or provides ambiguous terms." *Hubbard Chevrolet Co. v. General Motors Corp.,* 873 F.2d 873, 876–77 (5th Cir.1989) (interpreting Michigan law).

*F. Unjust Enrichment—Count VI*

 In order to successfully demonstrate unjust enrichment, a plaintiff must prove "(1) receipt of a benefit by the defendant from the plaintiff, and (2) which benefit it is inequitable that the defendant retain." *B & M Die Co. v. Ford Motor Co.,* 167 Mich.App. 176, 421 N.W.2d 620, 622 (1988). "Unjust enrichment works to imply a contract in order to prevent one party from inequitably receiving and retaining a benefit from another." *Kuhfeldt v. Liberty Mut. Ins. Co.,* 833 F.Supp. 632,

636 (E.D.Mich.1993). This form of implied contract will only apply if there is no express contract between the parties; there "cannot be an express and an implied contract covering the same subject matter at the same time." *Id.* at 636–37 (citing *Campbell v. City of Troy,* 42 Mich.App. 534, 202 N.W.2d 547, 549 (1972)). "The process of imposing a 'contract-in-law' or a quasi-contract to prevent unjust enrichment is an activity which should be approached with some caution." *B & M Die Co.,* 421 N.W.2d at 622.

## III. ANALYSIS

*A. Plaintiff's New Jersey Franchise Practices Act—Count I*

In Count I of the Complaint, the Plaintiffs contend that DaimlerChrysler has not satisfied its obligations under the NJFPA in connection with DaimlerChrysler's termination of the Plymouth brand, in violation of section 10–13 of the Act. Compl. at ¶¶ 61–64. Although there seems to be no dispute as to the applicability of the NJFPA in this case, by way of introduction, the Court finds that the Plaintiffs are "motor vehicle franchisees" and the Defendant is a "motor vehicle franchisor" as defined by the Act, and that the provisions of the NJFPA are fully applicable to each of them respectively. *See Cent. Jersey Freightliner, Inc. v. Freightliner Corp.,* 987 F.Supp. 289, 297 (D.N.J.1997).

 The Court exercises diversity jurisdiction with respect to Count I, a claim that alleges violations of the NJFPA, a state law. Where a court has diversity jurisdiction over a state law claim, the court is obligated to apply the law of the forum state. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."); *New Castle*

*County v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 243 F.3d 744, 749 (3d Cir. 2001); *Clark v. Modern Group Ltd.,* 9 F.3d 321, 326 (3d Cir.1993). When the highest state court has not spoken on a state law issue, the federal court sitting in diversity is required to predict how that court would rule. *New Castle County,* 243 F.3d at 749; *Clark,* 9 F.3d at 326–27; *Borman v. Raymark Indus., Inc.,* 960 F.2d 327, 331 (3d Cir.1992); *Erie Castings Co. v. Grinding Supply, Inc.,* 736 F.2d 99, 100 (3d Cir. 1984). The New Jersey Supreme Court has yet to address the 1991 amendments and interpret sections 13.2 through 13.4. Accordingly, in the absence of law from the State Supreme Court, this Court's role is to predict how that court would rule on these issues.

"It is axiomatic that any inquiry as to the meaning of a statute must begin with its language." *Northview Motors,* 227 F.3d at 93; *see also Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (articulating the cardinal canon of statutory interpretation, which is that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there"). "When words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Connecticut Nat'l Bank,* 503 U.S. at 254, 112 S.Ct. 1146. Accordingly, this Court's inquiry will begin with an examination of the language of the NJFPA.

The Court finds that the language of NJFPA sections 13.2 through 13.4 makes a number of distinctions. Section 13.2 of the NJFPA states that it applies where the termination occurs as a result of a termination or cessation of the franchisor's business operations. N.J.S.A. 56:10–13.2. The language 13.2 does not state that it is triggered by termination, cessation, or na-tionwide withdrawal of a brand or line. *Id.* NJFPA section 13.4 does, however, contemplate the consequences of termination or discontinuation of a brand or line of motor vehicles, and states that the termination, cancellation or discontinuation of a series, line, brand or class or new motor vehicle "shall be deemed to be the termination, cancellation or nonrenewal" of the franchise. N.J.S.A. 56:10–13.4.

■ "In the absence of a specific statutory definition, the language of a statute should be given its 'ordinary meaning and construed in a common sense manner to accomplish the legislative purpose.'" *Liberty Lincoln Mercury, Inc. v. Ford Motor Co.,* 171 F.3d 818, 822 (3d Cir.1999). Because the terms at issue here are not defined by the NJFPA, the Court will attribute to them their "ordinary" meanings. "Brand" is defined by Webster's II New Riverside University Dictionary as a "trademark or distinctive name of a product or manufacturer." Webster's II New Riverside University Dictionary 197 (1994). Similarly, "line" is defined by Webster in this context as "merchandise or services of a similar or related nature." *Id.* at 695. These terms relate to the identification of goods or services, in this case, Plymouth automobiles. Webster's defines "operation" as "[a]n act, process, or way of operating; [t]he condition of being operative or functioning;[a] method or process of productive activity." *Id.* at 824. Thus, the natural language definition of "business operations" means the actual performance or process of work as it relates to a company's business, commerce, trade or industry. In this context, business operations could include the actual design, production, or manufacturing of automobiles, shipping, or even administration of the business itself, *e.g.,* accounting. The Court predicts that the New Jersey Supreme Court would conclude that the

terms "brand" and "line," used by the legislature in 13.4, are not synonymous with the "business operations," used in section 13.2.

DaimlerChryler concedes that "a line is a brand or series of vehicles," and does not contest that Plymouth was a line or brand of vehicles. Def.'s 56.1 Stmt. at ¶ 6. It argues, however, that because the discontinuance of the Plymouth brand was a nationwide one, it falls within the parameters of NJFPA section 13.2, as a cessation of its business operations. Db. at 5–7. The Court concludes, however, after a plain language interpretation of the Act, that "cessation of business operations" is not interchangeable with "termination of a brand or line." The language does not permit such an interpretation, and the Court will not create an exception here. Had the New Jersey legislature desired a nationwide withdrawal or other termination of a brand or line to qualify for application of section 13.2, it could have explicitly done so, and could have used the same language contained in section 13.4. If the New Jersey legislature intended the Defendant's interpretation, the Court suggests that it amend the NJFPA. For the Court to construe the statute as the Defendant suggests, however, and equate termination or "nationwide withdrawal" of a brand or line of automobiles with cessation of business operations would effectively write section 13.4 out of the NJFPA.

The Court rejects the Defendant's argument that its "business operations" ceased, as required by the Act. Having examined the meaning of "business operations," the Court finds that the nationwide discontinuance of the Plymouth brand does not, in this case, constitute the cessation of business operations. This is particularly true in light of the fact that each of the Plymouth vehicles were transitioned or "rebadged" as Chrysler or Dodge vehicles.

See Def.'s 56.1 Stmt. at ¶ 69–70, Db. at 9, Tr. at 9:20–10:8. The Court further finds that the Defendant has presented no evidence that the conduct of their business operations as defined by this Court have changed, much less ceased. For example, from the record before the Court, it does not appear that the production, design, and shipment of the vehicles themselves has been altered, and the vehicles themselves continue to be distributed to authorized dealers nationwide as Chrysler and Dodge cars. The business operations of Daimler-Chrysler themselves have remained constant. The Court predicts that the New Jersey Supreme Court would find that the termination in this case was a termination and discontinuance of the Plymouth line or brand, which violated section 13.4 of the NJFPA. The termination did not involve a "cessation of business operations" as contemplated by the NJFPA, and the Court predicts that the New Jersey Supreme Court would conclude that section 13.2 does not apply here.

The Court concludes that the Act is unambiguous. *See Connecticut Nat'l Bank*, 503 U.S. at 253–54, 112 S.Ct. 1146. Nevertheless, the Court notes that the legislative history supports its conclusion. Specifically, the legislative history provides in pertinent part that "[t]he bill makes it clear that the removal or elimination of one or more lines or makes of vehicles under a single franchise agreement is nevertheless a termination of the franchise." Bill No. S.3486, Sponsor Statement at 6:2–4. It is clear that the legislature did not contemplate nationwide withdrawal of a line or make of vehicle as an exception to the 1991 amendments to the NJFPA.

The Court also rejects the arguments made by counsel for DaimlerChrysler at oral argument on March 29. Daimler-Chrysler argued that the cessation of business operations contemplated by the Act

includes termination of the license granted to Plymouth dealers to use the Plymouth trademark. Tr. at 21:7–12. The Court concludes that this can not constitute the cessation of business operations; if it could, every termination of a franchise could fall within the parameters of section 13.2, and the discontinuation described in section 13.4 would be rendered meaningless because every franchise involves the grant of a license to use the franchisor's trademark. Likewise, the Court rejects DaimlerChrysler's arguments that because stand-alone Plymouth dealers may have been put out of business, or because the individual plaintiffs may also be Chrysler or Jeep dealers, there was no violation of the NJFPA. *See* Tr. at 21:13–22:9. The Act requires that there be a change in the franchisor's business operations, not the franchisee's.

DaimlerChrysler also suggests in its papers that NJ CAR, the New Jersey automobile dealers' association of which the Plaintiffs are members, advised unsatisfied dealers not to sign the Discontinuance Agreement and influenced them to seek more compensation. Db. at 19–20; Def.'s 56.1 Stmt. ¶¶ 97–100. Plaintiffs's association with NJ CAR, however, is irrelevant to the Court's analysis of the NJFPA and its application to the facts here. Although the Defendant argues to the contrary, the Court likewise finds that whether individual plaintiffs in this case accepted DaimlerChrysler's compensation package in 1998 with respect to its discontinuance of the Eagle brand of vehicles is irrelevant.

The Court further finds that *Westfield Centre Service, Inc. v. Cities Service Oil Co.,* 158 N.J.Super. 455, 386 A.2d 448 (1978) and *Freedman Truck Center, Inc. v. General Motors Corp.,* 784 F.Supp. 167 (D.N.J.1992) are inapposite, and predicts that the New Jersey Supreme Court would decline to follow their holdings. Most im-

portantly, these cases were decided before the 1991 amendments to the NJFPA went into effect, and they therefore do not deal with the specific statutory issues at play here. Although the potential ramifications of a nationwide withdrawal are discussed in these cases, *see e.g., Freedman,* 784 F.Supp. at 172, the Court concludes that the 1991 amendments to the NJFPA changed the legal landscape and imposed a statutory scheme that must be followed. By enacting sections 13.2 through 13.4, which specifically deal with the issues currently before the Court, the New Jersey legislature has instructed courts to distinguish between termination of a brand of automobiles and cessation of business operations, and made no mention of the "abuse" discussed in those cases.

For the reasons set forth above, the Court grants the Plaintiffs's motion for summary judgment with respect to Count I.

### B. Plaintiff's New Jersey Franchise Practices Act—Count II

Count II of the Complaint alleges that DaimlerChrysler's "inequitable and coercive imposition of the Discontinuance Agreement as the sole terms or conditions for the compensation of Plaintiffs for the termination of their franchises" violated NJFPA sections 10–7.4(f) and 10–13.4. Compl. at ¶ 68. In particular, the Plaintiffs argue that DaimlerChrysler required an unconditional release without permitting them to except claims for outstanding financial obligations, in violation of section 10–7.4(f), failed to properly compensate dealers for the fair market value of the vehicles, in violation of section 13.3(b), and failed to repurchase inventory, parts, tools, supplies and signs, in violation of section 13.2. Pb. at 23.

Because the New Jersey Supreme Court has yet to address this issue directly, the

Court must predict how it would rule. *See, e.g., New Castle County*, 243 F.3d at 749. The Court predicts that the New Jersey Supreme Court would conclude that the Defendant's release does not violate NJFPA section 7.4(f). Specifically, the release contained in the Discontinuance Agreement is not unconditional, and does except from it amounts owed to the individual dealers. *See* Schoenberg Cert. Ex. Z at 3. The record further reflects that the Plaintiffs were given a choice in compensation packages between lump sum compensation and repayment pursuant to the terms of the SSA. Schoenberg Cert. Ex. AA. Viewing the evidence in a light most favorable to the Plaintiffs, the Court concludes that there are no issues of material fact, and summary judgment in the Defendant's favor is appropriate.

■ The Court further finds that the Plaintiffs are not entitled to recover under both NJFPA sections 13.2 and 13.3. Section 13.2 triggers recovery in the event of a "termination or cessation of a part of the franchisor's business operations throughout the United States, which is not a part of any change in the ownership, operation or control of all or any part of the franchisor's business . . . ." N.J.S.A. 56:10–13.2. In the case of all other terminations, motor vehicle franchisors must comply with the repayment obligations of section 13.3(b). The two sections and their remedies are mutually exclusive. Having already found that the Defendant's termination in this case was not a cessation of business operations, the Court further finds that the Defendant is required to satisfy the repayment obligations contained in section 13.3(b), and Plaintiffs may not seek the remedies of section 13.2.

*C. Plaintiff's Automobile Dealer's Day in Court Act Claim—Count III*

In Count III of the Complaint, the Plaintiffs assert that "through unilateral, illegal imposition of the onerous and financially punitive Discontinuance Agreement which has cut off Plaintiffs' sales of Plymouth new vehicles, [DaimlerChrysler] has seriously hampered Plaintiffs' dealership business and has wrongly obviated [DaimlerChrysler's] obligation to compensate the franchisees for termination, to the dealers' detriment." Compl. at ¶ 72. In addition, the Plaintiffs contend that DaimlerChrysler "has conducted a substantial and comprehensive effort to coerce Plaintiffs into accepting inadequate payments for the unlawful termination of their franchise." Compl. at ¶ 73. The Court concludes, however, that viewed in the light most favorable to the Plaintiffs and extending all reasonable inferences to them, there are no genuine issues of material fact, and grants summary judgment in the Defendant's favor.

■ The Court finds that first three elements of the ADDCA have been met, *i.e.*, that the Plaintiffs are automobile dealers, that the Defendant is an automobile manufacturer engaged in commerce, and that their relationship was memorialized in individual franchise agreements. However, the Court concludes that there is no proof as to the fourth prong of the test, the "good faith" test. The Third Circuit has stated that in order to establish violation of the ADDCA, a plaintiff must demonstrate the presence of actual, or threatened, coercion or intimidation. *Northview Motors*, 227 F.3d at 93; *General Motors*, 263 F.3d at 326. The definition of good faith contained in the ADDCA provides that recommendation, endorsement, persuasion, and argument does not constitute lack of good faith. 28 U.S.C. § 1221(e). Likewise, termination of a franchise alone does not violate the ADDCA. *See Buono Sales, Inc. v. Chrysler Motors, Corp.*, 449 F.2d 715, 724 (3d Cir.1971). Instead, to

constitute a violation of the ADDCA, termination "must have previously been used as a threat in an attempt to force the dealer to do certain things." *Id.*

Accepting the Plaintiffs's statements and allegations regarding the Defendants conduct as true, the Court finds that DaimlerChrysler's allegedly coercive acts do not satisfy the standard under the ADDCA, and that there is no evidentiary basis to support the ADDCA claim. The termination, without more, is insufficient to constitute a violation, and the Plaintiffs have presented no evidence that DaimlerChrysler had used the threat of termination before, or terminated the Plymouth line in an attempt to force the dealers to take a particular course of action. The Plaintiffs have not presented admissible evidence of actual, or threatened, coercion or intimidation. Likewise, the Plaintiffs have not adduced facts of a wrongful demand by the Defendant or that they failed to comply with such a demand that would have resulted in sanction, had the demand not been complied with. *See General Motors,* 263 F.3d at 304. Instead, the evidence reveals that all dealers, including Plaintiffs, had a choice between two compensation packages, and there is no evidence that selection of either would have resulted in sanction. Similarly, there is no evidence in support of ulterior motive or pretext. *General Motors,* 263 F.3d at 327–28. Accordingly, the Court concludes that the conduct ascribed to the Defendant by the Plaintiffs does not constitute a lack of good faith under the ADDCA. Summary judgment is granted in the Defendant's favor, and Count III is dismissed.

### D. Breach of Contract—Count IV

Count IV alleges that the Discontinuance Agreement and termination of the Plymouth brand are breaches of the SSA and Additional Terms. Compl. at ¶¶ 83–

85. The Court finds that there was no such breach of contract, and summary judgment is entered in the Defendant's favor.

■ The Plaintiffs state that the SSA constituted a contract of adhesion, and that therefore, the contract must be construed against DaimlerChrysler, the drafter. Pb. at 25 (citing *Lozada v. Dale Baker Oldsmobile, Inc.,* 91 F.Supp.2d 1087, 1100–01 (W.D.Mich.2000)). *Lozada* states that "[w]here a contract is prepared by one party and offered for rejection or acceptance without opportunity for bargaining under circumstances in which the party cannot obtain the desired product or service except by acquiesing [sic] in the form agreement, Michigan courts will conclude that the contract is adhesive and therefore procedurally unconscionable." *Lozada,* 91 F.Supp.2d at 1100. The Plaintiffs have not, however, presented any facts or admissible evidence to the Court in support of its argument that the SSA was a contract of adhesion, and assertions unsubstantiated by the record do not satisfy the Plaintiffs' burden. The Court will not construe the SSA as a contract of adhesion.

■ The Plaintiffs argue that "[n]o provision of the SSA, or the Additional Terms made a part thereof, contemplated a discontinuance of the brand or permitted [DaimlerChrysler] to impose the onerous and financially oppressive Discontinuance Agreement on Plaintiffs." Pb. at 26. The Court disagrees. The Additional Terms contemplate termination of the agreement between the parties in the event of "the discontinuance by [DaimlerChrysler] of the production or distribution of all [DaimlerChrysler] vehicles listed on the Motor Vehicle Addendum," Mykulak Cert.App. F at ¶ 28(c)(v), which, according to DaimlerChrysler, "identifies the line-make sold under the particular [SSA]." Def.'s 56.1 Stmt. at ¶ 7. This is not contested by the Plain-

tiffs. The Court finds that DaimlerChrysler's discontinuance of the distribution of vehicles manufactured, badged, and marketed as Plymouth is consistent with Paragraph 28(c)(v) of the Additional Terms. Termination of the SSA under such circumstances did not constitute a breach of that contract.

Alternatively, the Plaintiffs argue that the repurchase and compensation terms contained in the Discontinuance Agreement differ from those detailed in the SSA, through incorporation of the Additional Terms, and therefore breach the SSA. Pb. at 26–27. However, DaimlerChrysler's September 19, 2000 letter to "All Plymouth Dealers" specifically provides that

> [a]s a result of this notice or your voluntary termination of the Plymouth [SSA] or Plymouth Direct Dealer Agreement at an earlier date, rest assured that at the appropriate time DaimlerChrysler ... will meet its repurchase obligations in accordance with the terms of Paragraph 29(a), (b), (c), (d) and (e) of the Plymouth [SSA] or Paragraph 21(a), (b), (c), (d) and (e) of the Plymouth Direct Dealer Agreement.

Schoenberg Cert. Ex. AA. Accordingly, this Court finds that there is no issue of material fact. There is no breach of contract, and summary judgment is entered in favor of DaimlerChrysler.

### E. Breach of the Implied Covenant of Good Faith and Fair Dealing— Count V

In Count V of the Complaint, the Plaintiffs allege that the Defendant "had an implied contractual duty of good faith and fair dealing towards Plaintiffs under the [SSA's]," and that the Discontinuance Agreement and continued "refusal to negotiate" breach that implied covenant. Compl. at ¶¶ 88–91.

The Court concludes that under Michigan law, the implied covenant of good faith and fair dealing does not apply. The Court finds that the SSA and Additional Terms did not vest DaimlerChrysler with the discretion to terminate the agreement; absent the presence of certain defined circumstances, the Defendant was not permitted to unilaterally terminate the SSA. The Court further finds that the parties unmistakably expressed their respective rights with respect to termination in the event of a discontinuance of the production or distribution of vehicles. The Additional Terms, and SSA through their incorporation, dictate with specificity the circumstances under which DaimlerChrysler may terminate the contract, and specifically contemplates discontinuance of the production or distribution of all vehicles, leaving DaimlerChyrsler with no discretion. Mykulak Cert.App. F at ¶ 28(c)(5). As with the breach of contract claim in Count IV, the Court disagrees with the Plaintiffs's position and finds that the discontinuance contemplated by Additional Terms paragraph 28(c)(v) is consistent with the termination of the Plymouth brand that occurred here. The contract leaves no room for a court to supply limits in terms of DaimlerChrysler's performance, and the portions of the SSA and Additional Terms at issue here specify the rights of the parties in the event of a termination in unmistakably express terms. Therefore, the Court concludes that the covenant is not properly applied to this case. The Plaintiffs have not raised any genuine issues of material fact, and summary judgment in the Defendant's favor is appropriate. Count V is dismissed.

### F. Unjust Enrichment—Count VI

Under Michigan law, there "cannot be an express and an implied contract covering the same subject matter at the same time." *Kuhfeldt,* 833 F.Supp. at 636–37.

There is no dispute that the SSA, and Additional Terms incorporated into the SSA, constituted a contractual agreement between the parties in the instant case. Similarly, the Plaintiffs have not presented evidence in support of the notion that the SSA does not represent an express contract. Here the Plaintiffs's relationship with the Defendant in the event of termination is covered by the SSA, an express contract. No genuine issue of material fact remains, and the Plaintiffs's unjust enrichment claim is dismissed.

## IV. CONCLUSION

The Court concludes that the Plymouth termination violated NJFPA section 13.4. Summary judgment is granted in favor of the Plaintiffs with respect to Count I, and accordingly, the Plaintiffs are entitled to pursue their claims for damages under the Act. The Court finds that no genuine issue of material fact exists with respect to the remaining claims in Plaintiffs' Complaint, and for the reasons stated in this opinion, the Court grants summary judgment in favor of the Defendant on Counts II through VI. An appropriate order accompanies this opinion.